**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DANIEL SCHLEIFER, a minor by Barry
Schleifer, his father; WILLIAM
MCCUTCHEON, a minor by M.
Parthenia Monagan, his mother;
LISA BRIGGS, a minor by Anne
Briggs, her mother; NORA LALLY-
GRAVES, a minor by Mary Ann
Lally-Graves, her mother; JILL
LANDERS JACQUITH, a minor by

Harry James Landers, her father;
ANNE BRIGGS; HARRY JAMES
LANDERS; WALDO DAVID LANDERS
JAQUITH,
Plaintiffs-Appellants,

v.

CITY OF CHARLOTTESVILLE,
Defendant-Appellee.

No. 97-1723

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-97-21-C)

Argued: May 5, 1998

Decided: October 20, 1998

Before WILKINSON, Chief Judge, and ERVIN and
MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the majority opinion, in which Judge Ervin joined. Judge Michael wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Mary Catherine Bauer, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellants. Lisa Robertson Kelley, OFFICE OF THE CITY ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Deborah C. Wyatt, WYATT & CARTER, Charlottesville, Virginia, for Appellants. W. Clyde Gouldman, II, OFFICE OF THE CITY ATTORNEY, Charlottesville, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

This appeal involves a challenge to the constitutionality of a juvenile nocturnal curfew ordinance enacted by the City of Charlottesville. The district court held that the ordinance did not violate the constitutional rights of minors, their parents, or other affected parties and declined to enjoin its enforcement. We agree that the ordinance is constitutional and affirm the judgment of the district court.

I.

On December 16, 1996, the Charlottesville City Council, after several months of study and deliberation, amended Section 17-7 of the City Code to enact a new juvenile nocturnal curfew ordinance. The City Council designed the curfew ordinance to:

> (i) promote the general welfare and protect the general public through the reduction of juvenile violence and crime within the City;

2

(ii) promote the safety and well-being of the City's youngest citizens, persons under the age of seventeen (17), whose inexperience renders them particularly vulnerable to becoming participants in unlawful activities, particularly unlawful drug activities, and to being victimized by older perpetrators of crime; and

(iii) foster and strengthen parental responsibility for children.

Charlottesville, Va., Code § 17-7, Intro.

Effective March 1, 1997, the ordinance generally prohibits minors, defined as unemancipated persons under seventeen, from remaining in any public place, motor vehicle, or establishment within city limits during curfew hours. The curfew takes effect at 12:01 a.m. on Monday through Friday, at 1:00 a.m. on Saturday and Sunday, and lifts at 5:00 a.m. each morning.

The ordinance does not restrict minors' activities that fall under one of its eight enumerated exceptions. Minors may participate in any activity during curfew hours if they are accompanied by a parent; they may run errands at a parent's direction provided that they possess a signed note. The ordinance allows minors to undertake employment, or attend supervised activities sponsored by school, civic, religious, or other public organizations. The ordinance exempts minors who are engaged in interstate travel, are on the sidewalk abutting their parents' residence, or are involved in an emergency. Finally, the ordinance does not affect minors who are "exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." Id. § 17-7(b)(8).

The ordinance sets forth a scheme of warnings and penalties for minors who violate it. For a first violation, a minor receives a verbal warning, followed by a written warning to the minor and the minor's parents. For subsequent violations, the minor is charged with a Class 4 misdemeanor. The ordinance also makes it unlawful for certain other individuals, including parents, knowingly to encourage a minor

3

to violate the ordinance. The full text of the ordinance is included as an appendix to the opinion.

Plaintiffs are five minors under age seventeen who are subject to the ordinance, one eighteen-year-old, and two parents of minor children. The minors allege that, with their parents' permission, they occasionally wish to engage in lawful activities which the curfew will not permit. These activities include attending late movies; getting a "bite to eat"; playing in a band; socializing with older siblings; and attending concerts in Richmond, which would bring them back through Charlottesville during curfew hours. The eighteen-year-old plaintiff alleges that he has been deprived of opportunities to associate with his younger friends by the ordinance. The parent plaintiffs allege that the ordinance interferes with their decisions on which activities, at what times, are appropriate for their children.

Plaintiffs brought this action for declaratory and injunctive relief, alleging that the ordinance violates their rights under the First, Fourth, Fifth and Fourteenth Amendments. At trial, plaintiffs dismissed their Fourth Amendment claims. Following trial, by order dated May 20, 1997, the district court rejected plaintiffs' remaining claims and denied their motion for a permanent injunction. Plaintiffs now appeal.

II.

Initially we must consider the level of scrutiny appropriate to this case. Plaintiffs contend that the ordinance infringes minors' constitutional liberties and therefore should be subject to strict scrutiny. It is true that "[a] child, merely on account of his minority, is not beyond the protection of the Constitution." Bellotti v. Baird, 443 U.S. 622, 633 (1979) (plurality opinion) (Bellotti II). Minors enjoy some rights under the First and Fourteenth Amendments before they attain adulthood. See, e.g., Planned Parenthood of Cent. Missouri v. Danforth, 428 U.S. 52, 74 (1976); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969). At the same time, the Supreme Court has made abundantly clear that children's rights are not coextensive with those of adults. See, e.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986); Bellotti II, 443 U.S. at 634; Ginsberg v. New York, 390 U.S. 629, 638 (1968); Prince v. Massachusetts, 321 U.S. 158, 168 (1944). "Traditionally at common law, and still today,

4

unemancipated minors lack some of the most fundamental rights of self-determination -- including even the right of liberty in its narrow sense, i.e., the right to come and go at will." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995).

In recognition of these customary limitations, "[t]he state's authority over children's activities is broader than over like actions of adults." Prince, 321 U.S. at 168. State laws do not permit children to drive a car before they reach a certain age. E.g., Va. Code Ann. § 46.2-334. Compulsory attendance laws require children to attend school. E.g., id. § 22.1-254; see also Prince, 321 U.S. at 166. Labor laws limit the opportunities of children to engage in gainful employment. E.g., Va. Code Ann. § 40.1-78; see also Prince, 321 U.S. at 166. These types of laws reflect the state's "general interest in youth's well being." Id.; see also City of Dallas v. Stanglin, 490 U.S. 19, 27 & n.4 (1989); Bykofsky v. Borough of Middletown , 401 F. Supp. 1242, 1256-57 (M.D. Pa. 1975), aff'd mem., 535 F.2d 1245 (3d Cir. 1976).

In light of the case law, two things seem clear. First, children do possess at least qualified rights, so an ordinance which restricts their liberty to the extent that this one does should be subject to more than rational basis review. Second, because children do not possess the same rights as adults, the ordinance should be subject to less than the strictest level of scrutiny. See Carey v. Population Servs. Int'l, 431 U.S. 678, 693 n.15 (1977) (plurality opinion) (when minors are involved the level of scrutiny "is apparently less rigorous than the `compelling state interest' test applied to restrictions on the privacy rights of adults"); Danforth, 428 U.S. at 75. We thus believe intermediate scrutiny to be the most appropriate level of review and must determine whether the ordinance is "substantially related" to "important" governmental interests. See United States v. Virginia, 518 U.S. 515, 533 (1996) (quoting Mississippi University for Women v. Hogan, 458 U.S. 718, 724 (1982); Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150 (1980)). We also conclude, however, that the ordinance survives constitutional attack under either a substantial or a compelling state interest standard. The narrow means chosen by the City in the ordinance serve strong and indeed compelling public needs.

5

III.

A.

The text of the Charlottesville curfew ordinance identifies three legislative purposes: (1) to reduce juvenile violence and crime within the city; (2) to protect juveniles themselves from being swept up in unlawful drug activities and from becoming prey to older perpetrators of crime; and (3) to strengthen parental responsibility for children. These enumerated purposes represent important and compelling governmental interests.

In Schall v. Martin the Supreme Court recognized that "[t]he `legitimate and compelling state interest' in protecting the community from crime cannot be doubted." 467 U.S. 253, 264 (1984) (quoting DeVeau v. Braisted, 363 U.S. 144, 155 (1960)). Indeed it constitutes "a weighty social objective." Brown v. Texas, 443 U.S. 47, 52 (1979). If government cannot ensure the safety of its citizens, it has failed them in the most fundamental sense. Schall further confirms that "this interest persists undiluted in the juvenile context," as the social costs of crime are high no matter what the age of the perpetrator. 467 U.S. at 264-65.

The City contends that its curfew ordinance was passed to combat the marked growth in the rate of juvenile crime both nationwide and within Virginia. During the preliminary injunction hearing Dr. William Ruefle, a criminologist expert in juvenile curfews, testified that these state and national growth trends were reflected in Charlottesville. In fact, the City produced evidence of a twenty-five percent increase in the delinquency caseload of Charlottesville's Juvenile and Domestic Relations Court between 1991 and 1996. Given the projected increase in the nation's juvenile population between 1995 and 2005, the problem of juvenile crime was unlikely to abate.

In addition, the City has documented two troubling features of the juvenile crime phenomenon. First, the City's evidence on nationwide trends indicated a high rate of recidivism among juveniles and a correlation between juvenile delinquency and adult criminal activity. Thus reducing juvenile crime was a pressing first step in reducing the overall impact of crime on the community. Second, Charlottesville's

6

City Council was concerned about the marked increase in the violence associated with juvenile crime. As the City's expert Dr. Ruefle stated in an affidavit submitted to the district court,"[j]uveniles in Virginia now commit serious property crimes at twice the rate of those 18 years of age and older, and since 1990, they also commit serious violent crimes at a higher rate than adults." In light of this evidence, Charlottesville's first stated purpose is undeniably compelling.

Likewise, the City's strong interest in fostering the welfare of children and protecting the youngest members of society from harm is well-established. See, e.g., Santosky v. Kramer, 455 U.S. 745, 766 (1982); Ginsberg, 390 U.S. at 640; Prince, 321 U.S. at 166-67. Courts have recognized "the peculiar vulnerability of children," Bellotti II, 443 U.S. at 634, and the Supreme Court long ago observed that "streets afford dangers for [children] not affecting adults." Prince, 321 U.S. at 169. Those dangers have not disappeared; they simply have assumed a different and more insidious form today. Each unsuspecting child risks becoming another victim of the assaults, violent crimes, and drug wars that plague America's cities. Given the realities of urban life, it is not surprising that courts have acknowledged the special vulnerability of children to the dangers of the streets. Nunez v. San Diego, 114 F.3d 935, 947 (9th Cir. 1997); In Re Appeal in Maricopa County, Juvenile Action No. JT9065297, 887 P.2d 599, 606 (Ariz. Ct. App. 1994) (Maricopa County); In Re J.M., 768 P.2d 219, 223 (Colo. 1989) (en banc); see also Bykofsky , 401 F. Supp. at 1257. Charlottesville, unfortunately, has not escaped these troubling realities. Two experienced City police officers confirmed to the district court that the children they observe on the streets after midnight are at special risk of harm.

Charlottesville's third purpose -- strengthening parental responsibility for children -- is also a significant interest. The City shares with parents and guardians a responsibility to protect children. Prince, 321 U.S. at 165-66; Pierce v. Society of Sisters , 268 U.S. 510, 535 (1925). State authority complements parental supervision, and "the guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors." Bellotti II, 443 U.S. at 637. The Supreme Court has acknowledged "the special interest of the State" in encouraging minors to seek parental advice in making important decisions. Id. at 639. And the Court has confirmed that the

7

state is appropriately concerned with the integrity of the family unit. Trimble v. Gordon, 430 U.S. 762, 769 (1977). Therefore, like the City's two preceding interests in reducing the incidence of juvenile crime and juvenile victimization, the City's third aim constitutes an important governmental purpose.

B.

Conceding for the sake of argument that the curfew's stated ends are sufficiently compelling, plaintiffs train their attack on the means by which the ordinance seeks to achieve its goals.

We agree with plaintiffs that the curfew must be shown to be a meaningful step towards solving a real, not fanciful problem. As the Supreme Court has said in the First Amendment context, the government "must do more than simply `posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) (citations omitted). This standard, however, has never required scientific or statistical "proof" of the wisdom of the legislature's chosen course. Cf. Ginsberg, 390 U.S. at 642-43 ("We do not demand of legislatures `scientifically certain criteria of legislation.'") (quoting Noble State Bank v. Haskell, 219 U.S. 104, 110 (1911)). The Supreme Court has recognized that"[i]t is unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique. But this merely illustrates that proving broad sociological propositions by statistics is a dubious business." Craig v. Boren, 429 U.S. 190, 204 (1976). This uncertain nature of remedial legislation is no reason for courts to fashion their own cures or to scuttle those the legislature has provided. In fact, "[f]ederal courts have always been reluctant to question the potential effectiveness of legislative remedies designed to address societal problems." Qutb v. Strauss, 11 F.3d 488, 493 n.7 (5th Cir. 1993).

Charlottesville was constitutionally justified in believing that its curfew would materially assist its first stated interest -- that of reducing juvenile violence and crime. The City Council acted on the basis of information from many sources, including records from Charlottes-

8

ville's police department, a survey of public opinion, news reports, data from the United States Department of Justice, national crime reports, and police reports from other localities. On the basis of such evidence, elected bodies are entitled to conclude that keeping unsupervised juveniles off the streets late at night will make for a safer community. The same streets may have a more volatile and less wholesome character at night than during the day. Alone on the streets at night children face a series of dangerous and potentially life-shaping decisions. Drug dealers may lure them to use narcotics or aid in their sale. Gangs may pressure them into membership or participation in violence. "[D]uring the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." Bellotti II, 443 U.S. at 635; see also Nunez , 114 F.3d at 947; Maricopa County, 887 P.2d at 606-07; In Re J.M., 768 P.2d at 223. Those who succumb to these criminal influences at an early age may persist in their criminal conduct as adults. Whether we as judges subscribe to these theories is beside the point. Those elected officials with their finger on the pulse of their home community clearly did. In attempting to reduce through its curfew the opportunities for children to come into contact with criminal influences, the City was directly advancing its first objective of reducing juvenile violence and crime.

Plaintiffs contend that the exclusion of seventeen-year-olds from the curfew is a fatal flaw in the ordinance. They argue that this group is responsible for one-third of all crimes committed by juveniles nationwide and that excluding seventeen-year-olds from the curfew thus renders the ordinance impermissibly underinclusive. However, the City's evidence documents a serious problem of crime among younger juveniles. In Charlottesville in 1995 eighty percent of juvenile arrests for the most serious crimes were of children aged ten to sixteen, and in 1996 eighty-five percent of such crimes were committed by this group. Furthermore, the City's decision to exclude seventeen-year-olds from coverage under the curfew is a legislative judgment that we are loath to second-guess. "[I]t is not the function of a court `to hypothesize independently on the desirability or feasibility of any possible alternative[s]' to the statutory scheme.. .. .. . `These matters of practical judgment and empirical calculation are for [the State].'" Lalli v. Lalli, 439 U.S. 259, 274 (1978) (quoting

9

Matthews v. Lucas, 427 U.S. 495, 515 (1976)) (alterations in original). In exercising its legislative judgment, the City was forced to balance the law enforcement benefit of subjecting seventeen-year-olds to the curfew against the greater law enforcement burden of doing so. Weighing benefits and burdens is what legislatures are about.

Plaintiffs also dispute the effectiveness of the curfew in reducing juvenile crime. They say that the real problem of juvenile crime is not at night, but in the after school hours. Plaintiffs make much of a report entitled Juvenile Offenders and Victims: 1996 Update on Violence, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep't of Justice 27 (1996), which asserts that only seventeen percent of violent juvenile crime occurs during typical curfew hours, while twenty-two percent happens between 2:00 p.m. and 6:00 p.m. on school days. The City responds that the lower rate of late-night crime may reflect the fact that several of the South Carolina cities in the study actually had late-night curfews in effect. And with respect to conditions in Charlottesville before the curfew, City police officers and Charlottesville's Commonwealth's Attorney confirmed that the most serious crimes committed by juveniles occurred during curfew hours. Further, the City Council considered evidence that juvenile offenses occurring in Charlottesville between 11:00 p.m. and 6:00 a.m. increased by thirty-eight percent during 1995 and a further ten percent during 1996. Thus the City had reason to believe that, in both volume and severity, nighttime juvenile crime was a serious, growing problem in Charlottesville.

Charlottesville's City Council concluded that a nighttime curfew might help curb this rising trend of juvenile crime. In making this decision, the City relied on the experience of cities like Lexington, Kentucky, where eight months of enforcing a nighttime juvenile curfew effected an almost ten percent decrease in juvenile arrests for the serious crimes of homicide, assault, robbery, rape, burglary, larceny, auto theft and arson. And the district court heard testimony that a curfew has the greatest chance of reducing juvenile crime in a smaller city like Charlottesville, where juvenile crime, though a serious problem, has not yet become totally uncontrollable. Fundamentally, however, this dispute about the desirability or ultimate efficacy of a curfew is a political debate, not a judicial one. If local communities conclude that curfews are ineffective in reducing crime, too onerous

10

to enforce, or too intrusive on the liberties of minors, then they are free to discontinue them. Yet local legislative bodies are entitled to draw their conclusions in light of experience with a curfew's operation, and not have their efforts at reducing juvenile violence shut down by a court before they even have a chance to make a difference.

Plaintiffs also dispute that the curfew will contribute much, if anything, to protecting juveniles from crime, the City's second objective. They deny that the streets are a particularly dangerous place for children at night, contending that the majority of crimes committed against children are committed by family members or acquaintances rather than by strangers on the street. The fact that children may be at risk at home or during the day means only that the curfew will not, unfortunately, protect juveniles from all crime. It does nothing to undermine the City's evidence that children remain at risk of crime in the street -- in fact, the City points out that in 1991 thirty-three percent of the violent crimes reported by juvenile victims nationwide occurred on the street. Juvenile Offenders & Victims: A National Report, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep't of Justice 22 (1995). The Constitution certainly does not put legislatures to the choice of solving the entirety of a social problem or no part of it at all. Plyler v. Doe, 457 U.S. 202, 216 (1982).

Further, the evidence presented by the City identified several special dangers of the nighttime hours: a vigorous street-level drug trade that flourishes during the late evening and early morning hours and that routinely uses children to facilitate drug transactions, thereby exposing them to a high degree of danger; the difficulties of apprehending perpetrators of crime at night, as criminal activity is less visible and less subject to monitoring by concerned neighbors and passers-by; and the increased degree of violence and seriousness of the crimes that are committed at night. The record documents that in Charlottesville in 1996 aggravated assaults were almost one and one-half times as likely to occur during curfew hours as non-curfew hours, robberies more than twice as likely to occur at these times, forcible rapes more than three times as likely during curfew hours, and incidents of drunk driving more than five times more likely to occur during curfew hours, trends that continued into the first months of 1997. By keeping children off the streets a few hours each night, the curfew

11

reduces the exposure of children to these well-known, and well-documented harms.

Finally, plaintiffs dispute the City's claim that the curfew will support the parental role in child-rearing, its third stated goal. They focus exclusively on the testimony of the parent plaintiffs, who clearly do not appreciate the curfew and do not welcome it as an enhancement of their authority. The City was entitled to believe, however, that a nocturnal curfew would promote parental involvement in a child's upbringing. A curfew aids the efforts of parents who desire to protect their children from the perils of the street but are unable to control the nocturnal behavior of those children. And a curfew encourages parents who ignore their children's nighttime activities to take a more active role in their children's lives. See Bykofsky, 401 F. Supp. at 1255; In Re J.M., 768 P.2d at 223. Finally, the curfew assists the efforts of parents who prefer their children to spend time on their studies rather than on the streets. City law enforcement officers related anecdotal evidence that some parents actively welcome the support of the authorities in establishing baselines for their children and in enforcing reasonable limits on the freedom of their children to wander the streets in the middle of the night. And the City Council acted on the basis of surveys and testimony at public hearings reflecting widespread approval of the curfew and the support it offers to parents' efforts to discipline their children.

C.

The Charlottesville curfew is not only "substantially related" to its stated purposes. The limited scope of the curfew and its numerous exceptions would satisfy even the strict scrutiny requirement of narrow tailoring. See Bernal v. Fainter, 467 U.S. 216, 219 (1984) (narrow tailoring requires that the government use the least restrictive means to advance its goals). Plaintiffs urge, however, that we follow the lead of the Ninth Circuit, which held that San Diego's curfew ordinance failed strict scrutiny review because the exceptions to the ordinance were not sufficiently detailed and comprehensive to make the curfew the least restrictive means of serving San Diego's compelling ends. Nunez, 114 F.3d at 948-49.

The San Diego curfew applied to all minors under the age of eighteen, began at 10:00 p.m., and extended until "daylight immediately

12

following." Id. at 938. It contained four exceptions: (1) when a minor is accompanied by a parent or other qualified adult; (2) when a minor is on an emergency errand for his parent; (3) when a minor is returning from a school-sponsored activity; and (4) when a minor is engaged in employment. See San Diego, Cal., Municipal Code Art. 8, § 58.01, quoted in Nunez, 114 F.3d at 938-39.

By contrast, Charlottesville's curfew applies only to minors less than seventeen years of age, does not begin until midnight on weekdays and 1:00 a.m. on weekends, lifts at 5:00 a.m. each morning, and contains no fewer than eight detailed exceptions. Under Charlottesville's curfew, minors are allowed, inter alia , to remain on the sidewalk directly abutting their residences; to attend supervised activities sponsored by school, religious, public, civic or other similar organizations; to run errands for their parents; to undertake interstate travel; and to engage freely in any activity protected by the First Amendment.

The Charlottesville ordinance carefully mirrors the Dallas curfew ordinance that the Fifth Circuit found to satisfy strict scrutiny in Qutb, 11 F.3d at 490. Like the Charlottesville ordinance, the Dallas curfew covered fewer hours than San Diego's and affected minors under the age of seventeen, not eighteen. In addition to exceptions for employment and emergencies and when a minor is in the presence of a parent or guardian, the curfew at issue in Qutb included a broad exception for sponsored activities, a First Amendment exception, an exception for being outside on the sidewalk adjacent to the minor's home, and an exception for interstate travel. Id. Charlottesville's curfew is in fact even narrower in scope than the Dallas ordinance, as it affects fewer hours each night -- the Dallas curfew extended from 11:00 p.m. until 6:00 a.m. on weeknights and from 12:00 midnight to 6:00 a.m. on weekends, one hour more each day than the Charlottesville ordinance. This curfew, with its narrow scope and comprehensive list of exceptions, represents the least restrictive means to advance Charlottesville's compelling interests. Thus, it would survive even strict scrutiny if that were the appropriate standard of review.

IV.

We next address plaintiffs' claims that the Charlottesville ordinance violates the constitutional rights of parents. Plaintiffs assert that

13

parents have a constitutionally protected right to direct their children's upbringing without undue government interference. They urge that this right includes decisions whether to allow their children to engage in activities after the curfew takes effect. The ordinance interferes with this right, they conclude, by prohibiting children's activities that have the parents' full approval but do not fall under one of the ordinance's eight exceptions.

Not every state restriction of a child's freedom derivatively abridges the fundamental rights of parents. The Supreme Court has rejected the view that parents possess an unqualified right to raise children that trumps any government regulation of their children's conduct. In Prince, the Court recognized "that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." 321 U.S. at 167; see also Jehovah's Witnesses in Wash. v. King County Hosp. Unit No. 1 (Harbor-View), 390 U.S. 598 (1968) (per curiam), aff'g 278 F. Supp. 488 (W.D. Wash. 1967); Bykofsky, 401 F. Supp. at 1262. Furthermore, were we to accept plaintiffs' argument, future litigants could simply artfully plead violations of parental rights to avoid the Supreme Court's determination that children do not possess all the freedoms of adults. Arguments based on minors' rights to engage in particular conduct would be routinely recast as arguments based on parents' rights to allow their children to engage in precisely the same conduct.

We are mindful that the Supreme Court has suggested in other contexts that parents may possess a fundamental right against undue, adverse interference by the state. See Wisconsin v. Yoder, 406 U.S. 205, 231 (1972) (state compulsory high school attendance law interfered with "traditional concepts of parental control over the religious upbringing and education of their minor children"); Stanley v. Illinois, 405 U.S. 645, 651 (1972) (state presumption that unmarried father was unfit parent undermined "the interest of a parent in the companionship, care, custody, and management" of child); Meyer v. Nebraska, 262 U.S. 390, 400 (1923) (state prohibition against teaching of foreign languages frustrated "the natural duty of the parent to give his children education suitable to their station in life"). We do not believe, however, that cases involving a parent's custodial rights or authority to direct a child's education support plaintiffs' claim. The Charlottesville ordinance, prohibiting young children from remaining

14

unaccompanied on the streets late at night, simply does not implicate the kinds of intimate family decisions considered in the above cases.

Finally, several of the exceptions to the Charlottesville curfew do accommodate the rights of parents. See Qutb, 11 F.3d at 496. These include the exception for minors accompanied by a parent and the exception for minors running an errand at the direction of a parent. In general, the same reasons that lead us to reject the constitutional challenges of the minor plaintiffs even under strict scrutiny apply to the claims of the parent plaintiffs. Cf. Bykofsky, 401 F. Supp. at 1264. The limited curtailment of juvenile liberty in the ordinance violates neither a minor's nor a parent's rights.

V.

Finally, we consider plaintiffs' claims that various exceptions to the ordinance are unconstitutionally vague. A law is not void for vagueness so long as it "(1) establishes `minimal guidelines to govern law enforcement,' and (2) gives reasonable notice of the proscribed conduct." Elliott v. Administrator, Animal and Plant Health Inspection Serv., 990 F.2d 140, 145 (4th Cir. 1993) (citation omitted). In statutes imposing criminal penalties, "the standard of certainty is higher." Kolender v. Lawson, 461 U.S. 352, 359 n.8 (1983). Yet clarity even in a criminal code can be a receding mirage. Thus the vagueness doctrine cannot "convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Colten v. Kentucky, 407 U.S. 104, 110 (1972).

Striking down ordinances (or exceptions to the same) as facially void for vagueness is a disfavored judicial exercise. Nullification of a law in the abstract involves a far more aggressive use of judicial power than striking down a discrete and particularized application of it. Of course there will be hard cases under any law. And of course all the particular applications of any general standard will not be immediately apparent. That is no reason, however, for courts to scrap altogether the efforts of the legislative branch. It is preferable for courts to demonstrate restraint by entertaining challenges to applications of a law as those challenges arise.

15

The Charlottesville ordinance provides an exception for those minors who are "exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." Charlottesville, Va., Code § 17-7(b)(8). Plaintiffs insist that this exception accords standardless discretion to law enforcement officers to decide whether or not the exception applies. According to plaintiffs, it also forces citizens to learn a complex body of constitutional law in order to comprehend its scope.

We decline to punish the City for its laudable effort to respect the First Amendment. See CISPES (Committee in Solidarity with the People of El Salvador) v. FBI, 770 F.2d 468, 474 (5th Cir. 1985). A broad exception from the curfew for such activities fortifies, rather than weakens, First Amendment values. Plaintiffs basically attempt to place city councils between a rock and a hard place. If councils draft an ordinance with exceptions, those exceptions are subject to a vagueness challenge. If they neglect to provide exceptions, then the ordinance is attacked for not adequately protecting First Amendment freedoms. It hardly seems fitting, however, for courts to chastise elected bodies for protecting expressive activity. The Charlottesville ordinance is constitutionally stronger with that protection than without.*

The First Amendment exception also does not accord unfettered discretion to law enforcement officials. Every criminal law, of course, reposes some discretion in those who must enforce it. The mere possibility that such discretion might be abused hardly entitles courts to strike a law down. Police Chief Wolford's deposition, relied on by plaintiffs, does not indicate an actual risk of arbitrary enforcement. In response to a question from plaintiffs' counsel about whether a late

_____

*The dissenting opinion suggests that the First Amendment exception would be improved if it included a scienter element. See post at 52. A scienter requirement might serve a beneficial narrowing function if § 17-7(b)(8) imposed criminal liability. The provision, however, provides an exception from liability for persons who otherwise would be in violation of the curfew. It is not clear why the dissent would want to narrow this safe haven by requiring minors to satisfy an additional state-of-mind requirement.

16

night conversation about politics between two fifteen-year-olds in a coffee house fell within the exception for First Amendment activities, he stated: "You're indoors, it's a public location, I, I think technically under the ordinance it may be a violation. I doubt whether we would deal with it." Such hedged deposition testimony about a speculative hypothetical does not demonstrate that police will enforce the curfew arbitrarily. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 503 (1982).

The First Amendment exception provides adequate notice to citizens. It is perfectly clear that core First Amendment activities such as political protest and religious worship after midnight would be protected. It is equally clear that rollerblading would not. Between these poles may lie marginal cases, which can be taken as they come. Id. at 503 n.21.

The ordinance also provides an exception for activities sponsored by civic organizations. Plaintiffs argue that the Supreme Court found the term "civic" to be vague when it struck down an ordinance that required permits for door-to-door solicitation but exempted several groups, including "Borough Civic Groups and Organizations." Hynes v. Mayor of Oradell, 425 U.S. 610, 621 (1976). We do not read Hynes to stand for the broad proposition that any use of the term civic is per se vague. The Court in Hynes found several of the terms used to describe the exempted groups, including "Borough Civic Groups and Organizations," to be unclear. Id. Here the language of the exception is clearer and includes activities sponsored by school and religious organizations in addition to civic organizations. Considered in this context, we believe that the City intended to give civic its ordinary meaning: "concerned with or contributory to general welfare and the betterment of life for the citizenry of a community or enhancement of its facilities." Webster's Third New International Dictionary (Unabridged) 412 (1961). We decline to find this everyday use of the term civic to suffer an ambiguity of constitutional magnitude. See Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).

The ordinance also creates an exception in cases where a minor is involved in an emergency. Without citation to authority, plaintiffs pose a variety of hypothetical situations in which this exception may or may not apply. For example, they wonder whether the exception

17

would include the need to go to a store to purchase cough medicine or a thermometer. Once again, the existence of questions at the margins does not justify striking down the exception altogether. A brief review of the exception illuminates many situations to which it plainly applies. The ordinance specifically defines emergency as "refer[ring] to unforeseen circumstances, or the status or condition resulting therefrom, requiring immediate action to safeguard life, limb or property." Charlottesville, Va. Code § 17-7(a). It further details that "[t]he term includes, but is not limited to, fires, natural disasters, automobile accidents, or other similar circumstances." Id. While "[t]here is little doubt that imagination can conjure up hypothetical cases" to test the meaning of emergency, these speculative musings do not render this term unconstitutionally vague. American Communications Ass'n v. Douds, 339 U.S. 382, 412 (1950).

Plaintiffs' vagueness claims threaten to make the drafting of a curfew ordinance an impossible task. The practical exceptions to the City's curfew shall not provide the cause of its demise.

VI.

Our dissenting colleague insists that the Charlottesville ordinance must satisfy strict scrutiny, that it is not narrowly tailored, and that it is void for vagueness. Under the dissent's stringent application of these standards, however, no curfew ever would pass constitutional muster. In particular, no ordinance would survive the dissent's version of strict scrutiny, which disregards the Supreme Court's recognition that such inquiry should not be "strict in theory, but fatal in fact." See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995) (internal quotation marks omitted). Any locality in the nation that chose to enact a curfew would ultimately see it picked to death in the courts. A brief look at the dissent's analysis indicates why this is so.

To begin with, the dissent downplays the interests of the community, namely Charlottesville's goals of promoting the well-being of its youngest citizens and of fostering parental responsibility. The dissent's suggestion that these interests are compelling only when the state proceeds in a manner "supportive of the parental role," post at 41, is not consistent with the prevalence of legislative measures (such as age limitations on drinking and on driving) that may, on occasion,

18

frustrate the desires of individual parents. Moreover, by granting a citizen's veto to every parent in the community, the dissent would convert the compelling interest requirement into a rule of unanimity. This high a constitutional bar is antithetical to the values of democratic innovation.

The same disablement of democratic authority is evident in the dissent's strict reading of means. The dissent does agree that Charlottesville's interest in reducing juvenile crime is compelling, but then subjects the curfew to an impossibly narrow tailoring standard. Tellingly, the dissent fails to point to less restrictive means that the City might have employed. Forbidding preventive measures such as curfews propels localities to the harshest of alternatives -- waiting for juveniles actually to commit criminal offenses and then apprehending, prosecuting, and punishing them. Neither minors nor the City would gain from this result.

Finally, no ordinance could ever meet the precision envisioned by the dissent's "strict vagueness standard." Post at 49. The dissent argues that the labyrinthine nature of First Amendment doctrine requires a curfew exception drawn in labyrinthine detail. Forcing city councils to pursue such an elusive goal would prevent them from ever passing an ordinance. The vagueness doctrine's basic notice principle does not impose such an impediment.

The Charlottesville curfew serves not only to head off crimes before they occur, but also to protect a particularly vulnerable population from being lured into participating in such activity. Contrary to the dissent's protestation, we do not hold that every such curfew ordinance would pass constitutional muster. The means adopted by a municipality must bear a substantial relationship to significant governmental interests; the restrictiveness of those means remains the subject of judicial review. As the district court noted, however, the curfew law in Charlottesville is "among the most modest and lenient of the myriad curfew laws implemented nationwide." Charlottesville's curfew, compared to those in other cities, is indeed a mild regulation: it covers a limited age group during only a few hours of the night. Its various exceptions enable minors to participate in necessary or worthwhile activities during this time. We hold that Charlottes-

19

ville's juvenile curfew ordinance comfortably satisfies constitutional standards.

Accordingly, we affirm the judgment of the district court. We do so in the belief that communities possess constitutional latitude in devising solutions to the persistent problem of juvenile crime.

AFFIRMED

Appendix

AN ORDINANCE
TO AMEND AND REORDAIN SECTION 17-7 OF CHAPTER 17
OF THE CHARLOTTESVILLE CITY CODE, 1990,
AS AMENDED, RELATING TO A GENERAL CURFEW
FOR MINORS

BE IT ORDAINED by the Council of the City of Charlottesville, Virginia that:

1. Section 17-7 of the Code of the City of Charlottesville, 1990, as amended, is hereby amended and reordained, as follows:

Section 17-7 Curfew for Minors.

The purpose of this section is to: (i) promote the general welfare and protect the general public through the reduction of juvenile violence and crime within the City; (ii) promote the safety and well-being of the City's youngest citizens, persons under the age of seventeen (17), whose inexperience renders them particularly vulnerable to becoming participants in unlawful activities, particularly unlawful drug activities, and to being victimized by older perpetrators of crime; and (iii) foster and strengthen parental responsibility for children.

(a) Definitions.

As used within this section 17-7, the following words and phrases shall have the meanings ascribed to them below:

"Curfew hours" refers to the hours of 12:01 a.m. through 5:00 a.m. on Monday through Friday, and 1:00 a.m. through 5:00 a.m. on Saturday and Sunday.

"Emergency" refers to unforeseen circumstances, or the status or condition resulting therefrom, requiring immediate action to safeguard life, limb or property. The term includes, but is not limited to, fires, natural disasters, automobile accidents, or other similar circumstances.

"Establishment" refers to any privately-owned place of business within the City operated for a profit, to which the public is invited, including, but not limited to any place of amusement or entertainment. With respect to such Establishment, the term"Operator" shall mean any person, and any firm, association, partnership (and the members or partners thereof) and/or any corporation (and the officers thereof) conducting or managing that Establishment.

"Minor" refers to any person under seventeen (17) years of age who has not been emancipated by court order entered pursuant to Section 16.1-333 of the Code of Virginia, 1950, as amended.

"Officer" refers to a police or other law enforcement officer charged with the duty of enforcing the laws of the Commonwealth of Virginia and/or the ordinances of the City of Charlottesville.

"Parent" refers to:

> (1) a person who is a minor's biological or adoptive parent and who has legal custody of a minor (including either parent, if custody is shared under a court order or agreement);

> (2) a person who is the biological or adoptive parent with whom a minor regularly resides;

> (3) a person judicially appointed as a legal guardian of the minor; and/or

21

(4) a person eighteen (18) years of age or older standing in loco parentis (as indicated by the authorization of an individual listed in part(s) (1), (2) or (3) of this definition, above, for the person to assume the care or physical custody of the child, or as indicated by any other circumstances).

"Person" refers to an individual, not to any association, corporation, or any other legal entity.

"Public Place" refers to any place to which the public or a substantial group of the public has access, including, but not limited to: streets, highways, roads, sidewalks, alleys, avenues, parks, and/or the common areas of schools, hospitals, apartment houses, office buildings, transportation facilities and shops.

"Remain" refers to the following actions:

(1) to linger or stay at or upon a place; and/or

(2) to fail to leave a place when requested to do so by an officer or by the owner, operator or other person in control of that place.

"Temporary care facility" refers to a non-locked, non-restrictive shelter at which minors may wait, under visual supervision, to be retrieved by a parent. No minors waiting in such facility shall be handcuffed and/or secured (by handcuffs or otherwise) to any stationary object.

(b) It shall be unlawful for a minor, during curfew hours, to remain in or upon any Public Place within the City, to remain in any motor vehicle operating or parked therein or thereon, or to remain in or upon the premises of any Establishment within the City, unless:

(1) the minor is accompanied by a parent; or

(2) the minor is involved in an emergency; or

(3) the minor is engaged in an employment activity, or is going to or returning home from such activity, without detour or stop; or

22

(4) the minor is on the sidewalk directly abutting a place where he or she resides with a parent; or

(5) the minor is attending an activity sponsored by a school, religious, or civic organization, by a public organization or agency, or by another similar organization or entity, which activity is supervised by adults, and/or the minor is going to or returning from such an activity without detour or stop; or

(6) the minor is on an errand at the direction of a parent, and the minor has in his or her possession a writing signed by the parent containing the following information: the name, signature, address and telephone number of the parent authorizing the errand, the telephone number where the parent may be reached during the errand, the name of the minor, and a brief description of the errand, the minor's destination(s) and the hours the minor is authorized to be engaged in the errand; or

(7) the minor is involved in interstate travel through, or beginning or terminating in, the City of Charlottesville; or

(8) the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly.

(c) It shall be unlawful for a minor's parent to knowingly permit, allow or encourage such minor to violate 17-7(b).

(d) It shall be unlawful for a person who is the owner or operator of any motor vehicle to knowingly permit, allow or encourage a violation of 17-7(b).

(e) It shall be unlawful for the Operator of any Establishment, or for any person who is an employee thereof, to knowingly permit, allow or encourage a minor to remain upon the premises of the Establishment during curfew hours. It shall be a defense to prosecution

23

under this subsection that the Operator or employee of an Establishment promptly notified the police department that a minor was present at the Establishment after curfew hours and refused to leave.

(f) It shall be unlawful for any person (including any minor) to give a false name, address, or telephone number to any officer investigating a possible violation of this section 17-7.

(g) Enforcement.

(1) Minors. Before taking any enforcement action hereunder, an officer shall make an immediate investigation for the purpose of ascertaining whether or not the presence of a minor in a public place, motor vehicle and/or Establishment within the City during Curfew hours is in violation of 17-7(b).

(A) If such investigation reveals that the presence of such minor is in violation of 17-7(b), then:

(1) if the minor has not previously been issued a warning for any such violation, then the officer shall issue a verbal warning to the minor, which shall be followed by a written warning mailed by the police department to the minor and his or her parent(s), or

(2) if the minor has previously been issued a warning for any such violation, then the officer shall charge the minor with a violation of this ordinance and shall issue a summons requiring the minor to appear in court (Ref. Va. Code § 16.1-260(H)(1)). And

(B) As soon as practicable, the officer shall:

(1) release the minor to his or her parent(s); or

24

(2) place the minor in a temporary care facility for a period not to exceed the remainder of the curfew hours, so that his or her parent(s) may retrieve the minor; or

(3) if a minor refuses to give an officer his or her name and address, refuses to give the name and address of his or her parent(s), or if no parent can be located prior to the end of the applicable curfew hours, or if located, no parent appears to accept custody of the minor, the minor may be taken to a nonsecure crisis center or juvenile shelter and/or may be taken to a judge or intake officer of the juvenile court to be dealt with in the manner and pursuant to such procedures as required by law. (Ref. Va. Code § 16.1-260(H)(1); § 16.1-278.6; #8E8E # 16.1-241(A)(1)).

(2) Others. If an investigation by an officer reveals that a person has violated 17-7(c), (d) and/or (e), and if the person has not previously been issued a warning with respect to any such violation, an officer shall issue a verbal warning to the person, which shall be followed by a written warning mailed by the police department to the person; however, if any such warning has previously been issued to that person then the officer shall charge the person with a violation and shall issue a summons directing the person to appear in court.

(h) Each violation of this section 17-7 shall constitute a Class 4 Misdemeanor.

2. Within one year after the effective date of March 1, 1997 of this ordinance, the City Manager shall review this ordinance and report and make recommendations to the City Council concerning the effectiveness of and the continuing need for the ordinance. The City Manager's report shall specifically include the following information: (a) the practicality of enforcing the ordinance and any problems with enforcement identified by the Police Department; (b) the impact and

cost of the ordinance; (c) other data and information which the Police Department believes to be relevant in assessing the effectiveness of the curfew ordinance; and (d) information from citizens regarding whether the ordinance has been administered and enforced fairly, including information regarding the age, gender and race of those charged or detained under the ordinance.

3. This ordinance shall be effective on March 1, 1997, at 12:01 a.m.

Approved by Council                    /s/ Jeanne Cox
December 16, 1996                    Clerk of City Council

MICHAEL, Circuit Judge, dissenting:

Today, the majority relegates kids to second-class citizenship by upholding Charlottesville's nighttime curfew for minors. Forbidding children to go out at night affects their fundamental rights, and such a restriction can be valid only if it withstands strict scrutiny. The Charlottesville curfew ordinance fails the test because it sweeps too broadly and usurps rather than supports parental authority over child rearing. The ordinance has another constitutional defect as well. Although it is a crime to violate the ordinance, the crime is only vaguely defined. The curfew does not apply when minors are "exercising First Amendment rights." This exception is unconstitutionally vague, leaving children, their parents, and the police to guess whether particular conduct is punishable as a crime. I respectfully dissent.

The majority attempts to brush this dissent aside by claiming that under my approach "no curfew ever would pass constitutional muster," ante at 18. I can as easily say that under the majority's approach no curfew would ever _fail_ constitutional muster. I'm afraid that my claim will be proven true. As long as the majority's standard is the law, a city council can pass a juvenile curfew as a routine measure because the justification is so easy to articulate. This should not stand under the Constitution. Children make up a quarter of our population, and their rights must not be ignored. A city council cannot order such a large segment of the community to stay at home for thirty-three hours of every week unless its curfew satisfies strict scrutiny. Subject-

26

ing Charlottesville's ordinance to this test does not subvert the "democratic authority" of the City Council, see ante at 18-19. On the contrary, the Council's authority must be exercised within constitutional bounds. The Council cannot, in the name of majority rule, take away constitutional rights of a minority, in this case all children under seventeen.

I.

Charlottesville's curfew targets all unemancipated persons under seventeen and applies between the hours of 12:01 a.m. and 5:00 a.m. on week nights and 1:00 a.m. and 5:00 a.m. on Friday and Saturday nights (Saturday and Sunday mornings). See Charlottesville, Va., Code § 17-7(a), (b) (hereinafter City Code). The ordinance makes it unlawful for these minors to "remain" in public (including private property open to the public) during curfew hours unless one of the curfew's eight exceptions are met. See id. One of these exceptions allows a minor to remain in public when "the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." Id. § 17-7(b)(8). A minor is also exempted from the curfew if he has written documentation that he is running an "errand" as directed by his parent and this document meets nine statutory criteria. See id. § 17-7(b)(6).[1] Minors who violate the curfew are subject to criminal punishment, and so are parents who "knowingly permit, allow or encourage" their children to defy the curfew. See id. § 17-7(c).

On March 10, 1997, Daniel Schleifer and four other minors, two adult parents of these minors, and an eighteen-year-old adult brought suit against the City of Charlottesville seeking a declaratory judgment that the curfew ordinance is unconstitutional. In district court the

_____

[1] The written document must contain the following information: (1) the minor's name; (2) the authorizing parent's name, (3) signature, (4) address, and (5) telephone number; (6) the telephone number where this parent may be reached during the pendency of the errand; (7) a "brief" description of the errand; (8) the minor's destination or destinations; and (9) "the hours the minor is authorized to be engaged in the errand." See City Code § 17-7(b)(6).

minor plaintiffs argued their case as a Fourteenth Amendment equal protection violation that implicates their fundamental rights, including First Amendment and due process rights and the right to intrastate movement. The parent plaintiffs argued that the curfew's restrictions impermissibly burdened their due process right to exercise parental discretion and control over the rearing of their children by making the exercise of this discretion and control illegal. Finally, all plaintiffs challenged the statute as being void for vagueness under the Due Process Clause.**2** The district court ruled for the City on these claims after a trial on the merits. I would reverse on the grounds that the curfew violates the Equal Protection Clause and is void for vagueness.

II.

Because the curfew criminalizes conduct of persons under the age of seventeen, the City's use of this age-based classification is subject to the limitations of the Fourteenth Amendment's Equal Protection Clause. Generally, laws making age-based classifications are subject to rational basis review, see Gregory v. Ashcroft, 501 U.S. 452, 470 (1991); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313-14 (1976), and thus are upheld if there is a rational relationship that ties the use of the classification to a legitimate governmental purpose, see Heller v. Doe, 509 U.S. 312, 319-21 (1993). However, when an age-based classification affects fundamental rights, a court must review the classification with "the most exacting scrutiny." See Clark v. Jeter, 486 U.S. 456, 461 (1988) (unanimous decision); see also Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 666 (1990).

The Charlottesville curfew ordinance does implicate fundamental rights. Cf. Kolender v. Lawson, 461 U.S. 352, 358 (1983) (loitering statute implicates First Amendment liberties and"constitutional right to freedom of movement"); Nunez v. City of San Diego, 114 F.3d 935, 944-45 (9th Cir. 1997) (holding that curfew infringed minors' fundamental rights). Normally, this would require the City to demonstrate that the ordinance satisfies strict scrutiny. However, because this case involves the fundamental rights of minors, and not those of adults, the

_____

**2** Like the majority, I read the plaintiffs' equal protection and due process claims as arising under the Fourteenth Amendment, rather than the Fifth Amendment as alleged in their complaint.

28

majority concludes that equal protection requires only intermediate scrutiny. See ante at 4-5. I disagree. Like the Fifth and Ninth Circuits, I would hold that the Equal Protection Clause subjects to strict scrutiny all governmental classifications that impact fundamental constitutional rights. See Nunez, 114 F.3d at 945-46; Qutb v. Strauss, 11 F.3d 488, 492 & n.6 (5th Cir. 1993). Under this standard the Charlottesville curfew is unconstitutional.

A.

Some mention of the unique status of children in our society is necessary to set the stage for the explanation of why strict scrutiny is necessary. The Supreme Court has long recognized that "`[c]hildren have a very special place in life which the law should reflect.'" Bellotti v. Baird, 443 U.S. 622, 633 (1979) (Bellotti II ) (plurality opinion). Accordingly, the Bellotti II plurality identified certain factors that the Court has used to justify situations where "the constitutional rights of children cannot be equated with those of adults." Id. at 634 (identifying the factors as "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing."). These factors reflect the view that "[t]he unique role in our society of the family . . . requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children." See id. at 633-34. This focus on the family and the parent-child relationship is central in the Court's decisions and must be examined to understand when there is justification for concluding that a minor's constitutional rights are not coextensive with those of an adult.

The Supreme Court has consistently reflected the traditional Western concept of the family as a "unit with broad parental authority over minor children." See Parham v. J.R., 442 U.S. 584, 602 (1979). Indeed, the Court's "`constitutional interpretation has consistently recognized [that] parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.'" Bellotti II, 443 U.S. at 638 (quoting Ginsberg v. New York, 390 U.S. 629, 639 (1968)). This authority is undoubtedly broad. When parental control comes into play, "unemancipated minors lack some of the most fundamental rights of self-determination -- including even the right of liberty in its narrow sense, i.e., the right to come

29

and go at will." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995).

However, a parent's broad authority does not generally carry over to the state. "[O]ur constitutional system long ago rejected any notion that a child is `the mere creature of the State' and, on the contrary, asserted that parents generally `have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'" Parham, 442 U.S. at 602 (quoting Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925)); see also Bellotti II , 443 U.S. at 637; Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). The Court has repeatedly said that it is "`cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" See Bellotti II, 443 U.S. at 638 (alteration in original) (quoting Prince v. Massachusetts, 321 U.S. 158, 166 (1944)). This broad recognition of the parents' right to control the upbringing of their children and of constitutional deference to parental authority is linked to the parents' duty to raise and protect their children. See Lehr v. Robertson, 463 U.S. 248, 257-58 (1983); Meyer v. Nebraska, 262 U.S. 390, 400 (1923). This deference to parents rests on the strong presumptions that "natural bonds of affection lead parents to act in the best interests of their children" and that "parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." See Parham, 442 U.S. at 602, 603; see also Bellotti II, 443 U.S. at 637; Yoder, 406 U.S. at 232.

Only in limited instances is the state able to assert a parent's broad power to control the activities of minors. For example, when the state acts as the legal guardian for a child, it will assume much, if not all, of a parent's traditional prerogatives. Similarly, the teachers and administrators of a public school will act "in loco parentis" while children are in their physical custody because parents"`delegate part of [their] authority'" to the school by placing their children under its instruction. See Vernonia, 515 U.S. at 655 (quoting 1 W. Blackstone, Commentaries on the Laws of England 441 (1769)); Bethel Sch. Dist.

30

No. 403 v. Fraser, 478 U.S. 675, 682 (1986); id. at 688 (Brennan, J., concurring in the judgment).**3**

In a similar way, the state (as parens patriae) may occasionally displace the parents' primary role in child rearing in order to protect a child's welfare. Thus, the state may trump parental discretion in delinquency proceedings (because parental control has already faltered), see Schall v. Martin, 467 U.S. 253, 265 (1984); In re Gault, 387 U.S. 1, 17 (1967), or in situations where a child's "physical or mental health is jeopardized," see Parham, 442 U.S. at 603; Yoder, 406 U.S. at 233-34. In these circumstances, the strong presumption that parents are able and willing to act in the best interests of their children may be rebutted. See Parham, 442 U.S. at 602. The state's power to displace parental discretion is limited, however, and must be justified on a case-by-case basis.

> That some parents "may at times be acting against the interests of their children" . . . creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests. The statist notion that governmental power should supersede parental authority in all  cases

_____

**3** The majority overlooks Vernonia's real thrust by quoting it to suggest that a minor's constitutional rights with respect to the state are subject to "customary limitations," ante at 5, that"includ[e] even the right of liberty in its narrow sense, i.e., the right to come and go at will," id. (quoting Vernonia, 515 U.S. at 654). Had the majority quoted the very next line in Vernonia, it would be obvious that the case makes clear that minors lack some of the most fundamental rights of self-determination with respect to their parents, not the state. See 515 U.S. at 654 ("They are subject, even as to their physical freedom, to the control of their parents or guardians."). Vernonia repeatedly emphasized that a minor's rights "vis-a-vis the State may depend on the individual's legal relationship with the State" and that "central" to the Court's decision was the fact that the children claiming a constitutional privacy right had "been committed to the temporary custody of the State as schoolmaster." See id. at 654; see also id. at 655, 656, 662, 665; cf. Nunez, 114 F.3d at 944-45 (rejecting as "out of context" the same quotation the majority uses from Vernonia).

31

because <u>some</u> parents abuse and neglect children is repugnant to American tradition.

<u>Id.</u> at 602-03 (citations omitted). Indeed,"[s]imply because the decision of a parent is not agreeable to a child or because it <u>involves risks</u> does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." <u>Id.</u> at 603 (emphasis added). Thus, except in special circumstances, the state normally must defer to the exercise of a broad degree of parental discretion.

It is also clear that while the state does have an independent interest in the welfare of children, this interest may be superseded by the parents' right to exercise broad discretion in raising their children. <u>See, e.g.</u>, <u>Yoder</u>, 406 U.S. at 229-30; <u>Pierce</u>, 268 U.S. at 534-35; <u>Meyer</u>, 262 U.S. at 400. Consequently, the rights of minors in relation to the state must be analyzed to consider not only the interests of the minor and the state but also the interests of parents. <u>Cf. Parham</u>, 442 U.S. at 600 (minor's "interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child"). Thus, the analysis of a minor's rights is complicated by the addition of this third party (a parent) who can bolster either the state's claim of authority or the minor's assertion of rights. <u>Cf. Yoder</u>, 406 U.S. at 231 (recognizing that "competing interests of parents, children, and the State" requires additional analysis).**4**

Although the Court's language in <u>Prince v. Massachusetts</u>, 321 U.S. 158 (1944), "taken at its broadest sweep" would lend support to the majority's expansive view of state power, <u>Prince</u> has limited application beyond its facts. <u>See Yoder</u>, 406 U.S. at 229. <u>Prince</u> involved a challenge to a conviction under a child labor law that made it criminal for parents to allow boys under the age of twelve and girls

_____

**4** Recently, in <u>Reno v. ACLU</u>, 117 S. Ct. 2329, 2348 (1997), the Court recognized that it is "clear that the strength of the government's interest in protecting minors is not equally strong" in all applications of the Communications Decency Act. Specifically, the Court indicated that the government's interest in protecting minors from indecent material would be greatly diminished where "a parent allow[s] her 17-year-old to use the family computer to obtain information on the Internet that she, <u>in her parental judgment, deems appropriate</u>." <u>See id.</u> (emphasis added).

32

younger than eighteen to sell newspapers and similar items. See Prince, 321 U.S. at 160-61. The Court sustained the conviction of Mrs. Prince for taking her ward (and niece), a nine-year-old girl, with her to assist in selling religious literature during the evening hours. See id. at 161-62; id. at 171 (Murphy, J., dissenting); see also Ginsberg, 390 U.S. at 638-39. The Court ruled that the state's interests in protecting the nine-year-old from psychological and physical harms that might result from Prince's activities were sufficient to justify the conviction. See 321 U.S. at 169-70. The Court was careful to state, however, that its decision did "not extend beyond the facts the case presents." See id. at 171. Accordingly, the Court has since limited Prince's application to situations where there is a "`substantial threat'" of harm to the "physical or mental health of the child or to the public safety, peace, order, or welfare." See Yoder, 406 U.S. at 230. In light of Yoder and the facts of Prince, I read Prince to allow a state to override parental discretion when the exercise of this discretion creates a substantial threat to the health and safety of children. In assessing this threat, Prince suggests that very young children are particularly vulnerable to harm.

This discussion underscores the Supreme Court's recognition of the special status of children and the predominance of the family unit. In particular, it underscores the Court's deference to the traditional authority of parents over the activities of their children. With this background, I now turn to the proper standard of scrutiny that must be applied in this case.

B.

The minors' equal protection challenge in this case must be analyzed under strict scrutiny. This conclusion flows from the basic question the majority ignores. Why are the federal constitutional rights of persons who are defined as minors under state law different from those of adults? The answer is that a minor's constitutional rights are basically the same as those of adults, but in certain situations there may be "significant state interest[s] . . . that [are] not present in the case of an adult" that will support a broader authority to regulate minors. See Planned Parenthood v. Danforth, 428 U.S. 52, 75 (1976).**5**

_____
**5** There are limited differences imbedded in our Constitution. For instance, the Twenty-Sixth Amendment guarantees the right to vote only to those eighteen and older. See U.S. Const. amend. XXVI.

33

When these interests justify regulation, they do so not because a minor's constitutional rights are <u>always</u> inferior to those of an adult but rather because the government's specific interests as regards minors are <u>sometimes</u> sufficient to allow a regulation to survive strict scrutiny. Accordingly, I would hold that the "fundamental rights" of minors are no less fundamental than those of adults and, thus, must be protected with the same vigor under a strict scrutiny analysis. <u>See Nunez</u>, 114 F.3d at 945.

1.

This conclusion is drawn from the Supreme Court's general approach to analyzing the rights of minors. The Court makes it clear that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." <u>See Danforth</u>, 428 U.S. at 74; <u>see also Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503, 511 (1969) ("[s]tudents . . . are `persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); <u>In re Gault</u>, 387 U.S. 1, 13 (1967) ("whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"). Indeed, the simple fact of age minority cannot <u>by itself</u> justify a dilution of constitutional protection. <u>See Bellotti v. Baird</u>, 443 U.S. 622, 633 (1979) (<u>Bellotti II</u>) (four-vote plurality opinion) ("A child, merely on account of his minority, is not beyond the protection of the Constitution."). Because "[c]onstitutional rights do not mature and come into being magically only when one attains the <u>state-defined</u> age of majority," <u>Danforth</u>, 428 U.S. at 74 (emphasis added), all persons, regardless of age, possess these rights under our system. <u>Cf. Bellotti II</u>, 443 U.S. at 635 ("children generally are protected by the <u>same</u> constitutional guarantees against governmental deprivations as are adults" (emphasis added)).

While minors generally possess the same rights against governmental deprivations as adults, considerations unique to minors can lend more weight to the government's interest in regulating this class. <u>See Nunez</u>, 114 F.3d at 945; <u>Qutb</u>, 11 F.3d 492 n.6. In <u>Bellotti II</u> a four-justice plurality noted that the Supreme Court has used three reasons to "justify[ ]" treating minors differently from adults under the Constitution: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the

34

importance of the parental role in child rearing." 443 U.S. at 634. If minors are to be accorded constitutional rights unequal to adults by reason of a particular regulation, these factors must support the government's assertion of greater authority. "`It is only upon such a premise . . . that a State may deprive children of .. . rights [when a similar deprivation] would be constitutionally intolerable for adults.'" Bellotti II, 443 U.S. at 635 n.13 (quoting Ginsberg, 390 U.S. at 650 (Stewart, J., concurring in the result)) (emphasis added).

The principle is illustrated by the Supreme Court's treatment of statutes forbidding a minor to obtain an abortion without parental consent. The Court has steadfastly insisted that such statutes must have a judicial bypass procedure. See, e.g., Bellotti II, 443 U.S. at 647-48 (consent statute); Danforth, 428 U.S. at 72-75 (same). The analysis used by the Court in Danforth is particularly instructive. After ruling that a spousal consent provision was unconstitutional, the Court addressed the statute's parental consent provision, saying that "much of what has been said above, with respect to [spousal consent], applies with equal force to [parental consent]." 428 U.S. at 74. The Court explained that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." Id. However, it acknowledged that "the State has somewhat broader authority to regulate the activities of children than of adults." See id. Consequently, the Court explained: "It remains, then, to examine whether there is any significant state interest in conditioning an abortion on the consent of a parent . . . that is not present in the case of an adult." See id. at 75 (emphasis added). This analysis demonstrates that the Court did not assume that the state always possesses broader authority to regulate children. To the contrary, it looked to whether there were significant interests specific to minors that justified the law, indicating that the law would be unconstitutional if these interests did not provide sufficient support for broader authority to regulate minors. After examining the interests advanced by the state, the Court struck down the parental consent law because it lacked "sufficient justification." See id. at 75.

The Court applied the same reasoning it used in Danforth to its subsequent parental consent cases. In Bellotti II the Court constructed its judicial bypass requirement to permit the consent undertaking to apply only to those minors who could justifiably be treated differently

35

from adults. Thus, a bypass procedure must allow a minor to demonstrate that either (1) she is mature and informed enough to make the abortion decision herself or (2) the abortion is in her best interests. See Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 511 (1990) (Akron II); Bellotti II, 443 U.S. 647-48. First, the state's justification that minors generally are not able "to make critical decisions in an informed, mature manner," Bellotti II, 443 U.S. at 634, is lost when a minor is adjudged mature and informed. Without the immaturity justification, the state has little reason to, and indeed cannot, require a parent's consent. Cf. Danforth, 428 U.S. at 75 (parent's interest in abortion decision is outweighed by mature minor's privacy right). Similarly, Bellotti's final consideration, that greater restrictions may be imposed on minors to reinforce the "importance of the parental role in child rearing," Bellotti II, 443 U.S. at 634, is premised on the presumption that parents will discharge their "responsibility for [their] children's well-being." See id. at 638-39. When a minor can demonstrate to a court that an abortion is in her best interests, the state's interest in involving the parents is reduced so much that the state can no longer require a minor to obtain parental consent. Therefore, when a minor is mature or an abortion is in her best interests, parental consent requirements are unconstitutional because the state's interests (specific to minors) do not justify a restriction that could not be applied to adults.

The parental consent example demonstrates that the government may sometimes, but not always, have interests in protecting minors that will allow it to impose special restrictions that narrow a minor's constitutional rights. It follows that courts must look at the regulation in question to determine if the state has sufficient justification to claim that a minor's rights are not the equal of an adult's. Only through this process can the state-defined age of majority have any significance insofar as constitutional rights are concerned.

2.

We know that we must evaluate the special interests that may justify a greater degree of governmental authority over minors in the context of the specific regulation. Still, the question remains as to which level of scrutiny is appropriate in cases involving constitutional rights. Logic compels that strict scrutiny apply.

It is clear from the discussion above that the majority's categorical approach is wrong. The majority would apply intermediate scrutiny in all cases involving minors, even those in which the government has no justification specific to minors for infringing upon their fundamental rights. In the latter situation the governmental interest in regulating minors under the majority's approach is identical to its interest in regulating adults. Yet the rights of minors could still be treated differently because their "fundamental" rights are not protected with strict scrutiny review. This has far ranging implications. Legislative bodies can pass many laws regulating conduct that would pass intermediate scrutiny but fail strict scrutiny. Under the majority's approach, such laws could be applied to all minors but could not be applied to any adults (whose fundamental rights are protected by strict scrutiny), even though the government had no reason to regulate minors any more than it did adults. The majority's holding, therefore, allows a minor to be deprived of constitutional rights when a similar deprivation would be constitutionally intolerable for adults, even though the state lacks any reason for different treatment. This result cannot be justified and essentially creates a second-class citizenship for all persons under the age of majority. For these persons, federal constitutional rights will "mature and come into being magically only when [they] attain[ ] the state-defined age of majority," Danforth, 428 U.S. at 74.**6**

Moreover, the majority's approach is completely inconsistent with the Supreme Court's decisions on parental consent in the abortion context. As discussed above, the state cannot constitutionally regulate a minor's abortion rights by requiring parental consent unless the regulation provides a judicial bypass. The majority's holding, however, would allow the state to regulate a minor's abortion rights if the

_____

**6** Although I disagree with the details of the approach taken by the district court, its analysis properly focused on the existence or absence of interests specific to minors that would justify"accord[ing] the state more regulatory latitude in governing children in certain circumstances." Schleifer v. City of Charlottesville, 963 F. Supp. 534, 541 (W.D. Va. 1997) (preliminary injunction analysis that was adopted in final ruling) (emphasis added). Under its approach, only "[w]hen the Bellotti factors . . . cut in favor of increased state oversight" will intermediate, rather than strict, scrutiny apply. See id. at 541-42.

state's regulation "`is substantially related' to `important' governmental interests," ante at 5. Such a result is clearly at odds with the Supreme Court's approach, as the state always has an important interest in regulating abortions. Beginning with Roe v. Wade, 410 U.S. 113 (1973), the Supreme Court has repeatedly recognized the state's "important and legitimate interest in protecting the potentiality of human life." Id. at 162. See also Planned Parenthood v. Casey, 505 U.S. 833, 871 (1992); Harris v. McRae, 448 U.S. 297, 324-25 (1980). This interest by itself would enable state abortion statutes to meet intermediate scrutiny. Therefore, the majority's holding that intermediate scrutiny should apply to the regulation of minors simply cannot be squared with the Supreme Court's insistence that a state cannot require a mature minor to obtain parental consent for an abortion. Indeed, if the majority was correct, the state could completely ban abortions for women under the age of eighteen. This confirms the fallacy of applying intermediate scrutiny to cases involving the fundamental rights of minors.

I would avoid these difficulties by applying strict scrutiny to all equal protection challenges involving fundamental rights, regardless of whether minors or adults are involved. Under this approach, minors must be treated the same as adults whenever the government lacks interests specific to minors to support more restrictive regulatory authority over them. Cf. Bellotti II, 443 U.S. at 635 n.13; Danforth, 428 U.S. at 74-75. However, when circumstances trigger governmental interests that are particular to minors, these interests, when coupled with the government's other interests, can make the government's claim for greater restrictions on minors much stronger. If these interests taken as a whole are compelling, the government's regulation (if narrowly tailored) will survive strict scrutiny with respect to minors, even though it would fail the test in the case of adults. See Nunez, 114 F.3d at 945 ("the Bellotti framework enables courts to determine whether the state has a compelling interest justifying greater restrictions on minors than on adults"); Qutb, 11 F.3d at 492 n.6 (same). This approach therefore provides a principled approach for deciding when children may be treated differently from adults for constitutional purposes.[7]

_____

[7] The majority relies on the plurality opinion in Carey v. Population Services International, 431 U.S. 678, 691-99 (1977), to support its argu-

38

The Fifth and Ninth Circuits adopt this approach and analyze minors' equal protection challenges with strict scrutiny when fundamental rights are implicated. See Nunez, 114 F.3d at 945-46; Qutb, 11 F.3d at 492 & n.6; cf. Hutchins v. District of Columbia, 144 F.3d 798, 805-10 (D.C. Cir. 1998) (opinion of Rogers, J.) (intermediate scrutiny); id. at 825-27 (Tatel, J., concurring in the judgment) (strict scrutiny); id. at 828 (Silberman, J., dissenting) (finding that no fundamental right was affected by curfew and therefore applying rational basis review to age-based equal protection challenge).**8** I would join these circuits and hold that the Equal Protection Clause subjects all governmental classifications impacting on the fundamental constitutional rights of minors to strict scrutiny.

C.

The Charlottesville curfew ordinance cannot withstand strict scrutiny and should be struck down. The Equal Protection Clause protects our constitutional rights by requiring that the government clear a high hurdle before regulating in the realm of fundamental rights. Under strict scrutiny review, "statutory classifications impinging on [a fun-

_____

ment that the Charlottesville curfew should be subjected to less than strict scrutiny. See ante at 5. Carey is a slender reed for this proposition. First, Carey's plurality opinion was decided before Bellotti II, and later cases have followed the reasoning of Bellotti II . Second, Carey itself is best read as a recognition that the state's unique and significant interests in regulating children will make it easier to justify greater restrictions on minors than on adults. See Carey, 431 U.S. at 693 (plurality opinion).
**8 Reno v. Flores**, 507 U.S. 292, 301-05 (1993), indicates that strict scrutiny should apply when the fundamental rights of minors are involved. In Flores a class of minors challenged an INS regulation that requires juvenile aliens to be placed in institutional group care facilities during the pendency of deportation proceedings if a guardian or adult relative is not available to take custody. The Court recognized that strict scrutiny applies "when fundamental rights are involved," see id. at 302, 305, but it rejected the minors' due process claim because it found that no fundamental right existed under the circumstances of the case. See id. at 305; cf. id. at 304 (stating that "the child's fundamental rights must not be impaired" by INS). The approach adopted by the Fifth and Ninth Circuits is therefore consistent with Flores' implication that strict scrutiny applies when a minor's fundamental rights are in the balance.

39

damental] right must be narrowly tailored to serve a compelling governmental interest." Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 666 (1990); see also Memorial Hosp. v. Maricopa County, 415 U.S. 250, 269 (1974). The Charlottesville ordinance fails the strict scrutiny test, notwithstanding its stated (and worthy) objectives of (1) reducing juvenile crime, (2) promoting the safety and well-being of juveniles, and (3) fostering and strengthening parental responsibility.

1.

I quite agree with the majority that protecting the community from serious crime is a compelling governmental interest. See ante at 6. The problem is that the Charlottesville curfew is not narrowly tailored to forward this goal. "Statutes affecting constitutional rights must be drawn with `precision,' and must be `tailored' to serve their legitimate objectives. . . . [I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, [the government] may not choose the way of greater interference. If it acts at all, it must choose `less drastic means.'" Dunn v. Blumstein, 405 U.S. 330, 343 (1972) (quoting Shelton v. Tucker , 364 U.S. 479, 488 (1960)).

By restricting the freedom of minors during curfew hours, the ordinance treats all minors under the age of seventeen as a threat to society in order to protect the community from juvenile crime. This broad restriction is not narrowly tailored to meet its objective of crime prevention. The ordinance treats all minors the same even though an exceedingly small percentage commit crimes. The Equal Protection Clause forbids such a crude grouping when fundamental rights are at stake, and limiting the curfew's hours and providing exceptions does not diminish this shortcoming.

This is not to say that emergency curfews that are broadly applicable and limited in duration are unconstitutional. Our circuit has previously, and properly, ruled that such emergency measures are a proper exercise of the state's police power. See, e.g. , United States v. Chalk, 441 F.2d 1277, 1280-83 (4th Cir. 1971). Here, however, we have a curfew with no sunset provision -- a curfew that sweeps in a vast class, all minors under seventeen, most of whom are law-abiding. The

40

Equal Protection Clause does not permit such a broad segment of society to be kept off the streets every night with the simple generalization, "We want to prevent crime." Narrow tailoring requires something less drastic.

2.

The City's second objective of promoting the safety and well-being of juveniles also falls short under strict scrutiny. This interest is not compelling in this case because the curfew displaces parental authority. Indeed, the majority says only that the City has a "strong" interest in protecting the youngest members of society from harm. See ante at 6-7. "Strong" interests are not sufficient to satisfy strict scrutiny. Only compelling interests suffice.

The City's stated interest in protecting minors under the age of seventeen is not compelling here because the curfew was not designed to be supportive of the parental role. Bellotti II recognized that "restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for . . . full growth and maturity" and therefore can justify an increased governmental authority to regulate the protected activities of minors. See 443 U.S. at 338-39 (emphasis added). This authority can be present when the governmental interest in regulation complements the traditional authority of the parent. By supporting the exercise of parental discretion, the state aligns its regulatory power with the interests of parents who have broad discretion to control the activities of their children. The combined interests of parents and the state therefore strengthen the justification for governmental regulation. Ginsberg, for example, prohibited the direct sale of pornographic magazines to minors in order to strengthen parents' control over their children's access to such material. See 390 U.S. at 631, 639. The Court was careful to note, however, that the government did not displace parental authority: "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." See id. at 639; see also Reno v. ACLU, 117 S. Ct. at 2346-48. Laws like the one in Ginsberg may thus be justified because they defer to parental authority and decisionmaking.

41

The Charlottesville ordinance, however, paternalistically displaces the exercise of parental discretion by making it illegal for parents to allow their children to move about independently at night. Yet parents are better able to assess their children's maturity and capacity for judgment than a city council. Parents may legitimately decide that the best way to raise their children is to permit them to be out on their own after midnight on occasion. See Nunez, 114 F.3d at 952. In other words, parents may legitimately conclude that the risk of granting children some independence is small compared to the benefits resulting from the gradual development of maturity and judgment that is needed in preparation for a responsible adult life. This exercise of parental discretion is impossible under the ordinance.[9]

Indeed, the ordinance was purposefully designed to displace parental discretion with the will of the City Council. On the day the curfew was enacted, the Council's agenda said the following about the curfew's purpose: "parental responsibility for the whereabouts of their children is the norm and where that does not exist, then the legal sanction should enforce such responsibility. Further, well communicated curfew ordinances . . . impose a community-wide standard on parents who are unable or unwilling to set such limits." (Emphasis added). Rather than supporting the parental role, this curfew supersedes it. It reflects the "statist notion that governmental power should supersede parental authority in all cases because some parents" fail to exercise control over their children. See Parham, 442 U.S. at 603. This governmental paternalism is "repugnant to American tradition." Id. Consequently, because the curfew attempts to achieve its stated purpose of promoting the safety and well-being of minors by displacing parental authority over the upbringing of children, the curfew does not serve a compelling governmental interest.

_____

**9** The curfew's sixth exception allows a minor to run an "errand" for his parent if he carries a signed document meeting nine statutory criteria. See City Code § 17-7(b)(6). This rigid exception, with its bureaucratic demand for detail, does not afford parents the discretion to allow their children to operate with any degree of independence. See supra note 1 (listing nine requirements).

42

3.

It follows that the ordinance's third stated purpose of fostering and strengthening parental responsibility also falls short. Ginsberg and Bellotti II recognize that laws "supportive of the parental role," Bellotti II, 443 U.S. at 638 (emphasis added), may justify some limitation on the constitutional rights of minors. However, when laws displace the primacy of parental discretion by imposing community-wide norms, the traditional authority of parents over child rearing is no longer available to support any limitation on the rights of minors. The curfew's attempt to foster and strengthen parental responsibility by displacing parental authority does not support a compelling state interest.

For these reasons, I would hold that the Charlottesville curfew fails to satisfy strict scrutiny and thus violates the Equal Protection Clause.

III.

Even if I could conclude that Charlottesville's curfew passed strict scrutiny, I would hold that the ordinance as adopted is void for vagueness under the Due Process Clause. More specifically, I would hold that the ordinance's First Amendment "exception" is impermissibly vague.

A.

The vagueness doctrine of the Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Although due process requires that a statute satisfy both requirements, the second is of special importance: "`a legislature [must] establish minimal guidelines to govern law enforcement'" and prevent arbitrary enforcement. See id. at 357-58 (citation omitted). When statutory language lacks sufficient "definiteness or certainty of expression," id. at 357, enforcement of the law is left to the purely subjective decisions of the police, prosecutors, and juries. See id. at 358; Village of Hoff-

43

man Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (citing Grayned v. City of Rockford, 408 U.S. 104 (1972)). Our Constitution's guarantee of due process of law makes this unacceptable. As the Supreme Court recognized a long time ago,

> "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government."

Kolender, 461 U.S. at 358 n.7 (quoting United States v. Reese, 92 U.S. 214, 221 (1875)). In other words, "[w]ell-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." Baggett v. Bullitt, 377 U.S. 360, 373 (1964). The law itself must draw a sufficiently clear line between the legal and the illegal for both our police and our citizens.

B.

Vagueness challenges may be brought against a statute "on its face" without regard to specific conduct, "as applied" to the plaintiff's conduct, or on both grounds. Facial challenges strike at the heart of the statute, and, if successful, invalidate any and all application of the challenged provision until it is given a construction that sufficiently clarifies it. See Steffel v. Thompson, 415 U.S. 452, 474 (1974); cf. Boddie v. Connecticut, 401 U.S. 371, 379 (1971) (as applied). I therefore agree with the majority that facial invalidity on vagueness grounds is strong medicine that is to be administered infrequently. See ante at 15. I disagree, however, with the majority's apparent belief that courts have discretion to avoid invalidating a facially unconstitutional statute. Cf. id. ("It is preferable for courts to demonstrate restraint by entertaining challenges to applications of a law as those challenges arise"). Courts rarely invalidate a law for facial vagueness. This is not because courts exercise discretionary restraint but because few facial challenges satisfy the high burden normally imposed. As a general rule, a law is vague on its face "only if [it] is impermissibly vague in all of its applications." See Hoffman Estates, 455 U.S. at 495 & n.7.

44

What the majority ignores is the exception to this general rule: when "a law reaches `a substantial amount of constitutionally protected conduct,'" facial vagueness challenges are "permit[ted]" and a plaintiff may attack the law "`as being vague as applied to conduct other than his own.'" See Kolender, 461 U.S. at 358 & n.8 (citations omitted) (First Amendment rights and freedom of movement affected by regulation of loitering and wandering); see also Hoffman Estates, 455 U.S. at 494-95 (recognizing that general rule applies only to statutes that "implicate[ ] no constitutionally protected conduct" (emphasis added)); Gooding v. Wilson, 405 U.S. 518, 521 (1972); Aptheker v. Secretary of State, 378 U.S. 500, 517 (1964) (facial challenge to law restricting international travel). This exception is "logically related and similar" to the doctrine of substantial overbreadth, see Kolender, 461 U.S. at 358 n.8, in that it is necessitated by the chilling effect that vague laws can have on the exercise of protected freedoms. As the Supreme Court has explained,

> The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

NAACP v. Button, 371 U.S. 415, 432-33 (1963) (citations and footnote omitted); see also Keyishian v. Board of Regents, 385 U.S. 589, 604, 609 (1967) ("The danger of [a] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [individuals] what is being proscribed."); Kolender, 461 U.S. at 358 n.8 (citing Button and Keyishian to support exception to general rule). Especially, then, when chilling effects are a danger and a "substantial amount" of protected activity is implicated, facial challenges must be permitted. In other words, we do not

45

have to wait for case-by-case judicial review of particular applications of the law.

Because the City's curfew regulates a substantial amount of protected activity, I would hold that it is subject to a facial challenge. The Supreme Court's decision in Kolender all but mandates this conclusion. In Kolender the Court held that a California loitering statute was unconstitutionally vague on its face. The law made it a crime for persons who "loiter or wander on the streets" to fail to provide "credible and reliable" identification when a peace officer requests it under circumstances that would justify a Terry stop. See 461 U.S. at 353, 357. See generally Terry v. Ohio, 392 U.S. 1 (1968), and later cases. The Court permitted a facial challenge because it found that the "law reache[d] a substantial amount of constitutionally protected conduct," see Kolender, 461 U.S. at 358 n.8 (internal quotation marks omitted), notwithstanding the dissenting argument that the law was not "impermissibly vague in all of its applications" and could not be facially attacked because it had an "unmistakable core  that a reasonable person would know is forbidden," id. at 370, 371-72 (emphasis added). The concern that led the Court to allow the facial challenge was the law's "`potential for arbitrarily suppressing First Amendment liberties'" and the "constitutional right to freedom of movement." See id. at 358 (quoting Shuttlesworth v. Birmingham, 382 U.S. 87, 90 (1965)). The same concerns underlie the curfew in this case. The main difference is Charlottesville's First Amendment"exception," but, as I explain below, this exception is itself impermissibly vague and therefore cannot save the statute from a facial challenge. Indeed, the need in this case for facial review is even stronger than that in Kolender because the curfew ordinance applies to all law-abiding minors under the age of seventeen. The law in Kolender, by contrast, required credible and reliable identification only when peace officers had already made a justifiable Terry stop, that is, after they had temporarily detained a suspect because of "a reasonable and articulable suspicion that the person seized [wa]s engaged in criminal activity," Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam) (following Terry). Accordingly, Kolender makes clear that a facial challenge is appropriate in this case.

The majority errs in asserting that because "core First Amendment activities" are protected by the ordinance, "marginal cases" may be

46

challenged as the statute is applied, <u>see</u> ante at 17. Even assuming that "core" activities are protected, this argument appears to parallel the dissenting view rejected by <u>Kolender</u>. The proper inquiry is not whether some core values are protected but whether the curfew "reaches `a substantial amount of constitutionally protected conduct,'" <u>Kolender</u>, 461 U.S. at 358 n.8 (quoting <u>Hoffman</u>, 455 U.S. at 494). The First Amendment protects a substantial amount of conduct in addition to "political protest and religious worship," ante at 17, and the vagueness doctrine must be applied to protect these rights.**10** Deferring review for as-applied challenges impermissibly risks chilling the exercise of a substantial amount of constitutionally protected activity. <u>Cf. 11126 Baltimore Blvd., Inc. v. Prince George's County</u>, 58 F.3d 988, 993-94 (4th Cir. 1995) (en banc) (ruling that "courts must permit" facial challenge when there is significant risk of chilling First Amendment speech because chill "`can be effectively alleviated only through a facial challenge'" (quoting <u>City of Lakewood v. Plain Dealer Publishing Co.</u>, 486 U.S. 750, 757 (1988))). I now turn to why Charlottesville's curfew is void for vagueness.

C.

"A law is considered [unconstitutionally] vague if `a person of normal intelligence must guess at its meaning and differ as to its application.'" <u>Elliott v. Administrator, Animal & Plant Health Inspection Serv.</u>, 990 F.2d 140, 145 (4th Cir. 1993) (quoting <u>Connally v. General Constr.</u>, 269 U.S. 385, 391 (1926)); <u>see also United States v. Lanier</u>, 117 S. Ct. 1219, 1225 (1997) (unanimous decision); <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 629 (1984). Although this standard applies generally to vagueness challenges, "[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment," <u>Hoffman Estates</u>, 455 U.S. at 498. When a statute involves the "economic regulation" of business, it is "subject to a less

_____

**10** The majority's citations to <u>Hoffman Estates</u> do not support the conclusion that federal courts may wait for as-applied challenges in "marginal cases," <u>see</u> ante at 17. <u>Hoffman Estates</u> clearly limits its analysis to those cases in which "no constitutionally protected conduct" is implicated by the challenged law. <u>See</u> 455 U.S. at 494-95, 497; <u>Kolender</u>, 461 U.S. at 458 n.8. A wait-and-see approach is justified only when there is no risk of chilling a substantial amount of protected activity.

47

strict vagueness test." Id. at 498. Similarly, if a law includes a scienter requirement, this too will relax the degree of clarity required because scienter can "mitigate a law's vagueness." See id. at 499. On the other hand, "the standard of certainty is higher" for statutes that impose criminal, as opposed to civil, sanctions. See Kolender, 461 U.S. at 358 n.8; Hoffman Estates, supra at 498-99. The last and "most important factor affecting the [degree of] clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." Id. at 499. If it does, "a more stringent vagueness test should apply" so that protected activity will not be chilled. See id.; see also Smith v. Goguen, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); Grayned, 408 U.S. at 109 ("[W]here a vague statute `abut[s] upon sensitive areas of basic First Amendment freedoms,' it `operates to inhibit the exercise of [those] freedoms.'" (second and third alterations in original)); Button, 371 U.S. at 432 (standard is "strict in the area of free expression"). These factors all point to the conclusion that the Charlottesville curfew must be evaluated for vagueness under a strict standard. Under that standard, I would hold that the ordinance's First Amendment exception violates the Due Process Clause.**11**

_____

**11** Federal courts do not look simply to the statutory language to determine if the law is vague. If a federal statute is involved, a federal court may construe the disputed provision to remove its vagueness. See United States v. 12 200-ft. Reels of Super 8mm. Film, 413 U.S. 123, 130 n.7 (1973); cf. CISPES v. FBI, 770 F.2d 468, 473-75 (5th Cir. 1985) (construing federal statute to avoid overbreadth). Likewise, when a state provision is challenged as vague on its face, a federal court must "`consider any limiting construction that a state court or enforcement agency has proffered.'" See Ward v. Rock Against Racism , 491 U.S. 781, 795-96 (1989) (quoting Hoffman Estates, 455 U.S. at 494 n. 5). If no narrowing interpretation is provided by the state, however, a federal court is "without power to remedy the [statute's] defects by giving [it] constitutionally precise content." See Hynes v. Mayor of Oradell, 425 U.S. 610, 622 (1976); see also Smith v. Goguen, 415 U.S. 566, 575 (1974).

48

D.

The last of the curfew's eight statutory exceptions allows a minor to remain in public during curfew hours when "the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly." City Code § 17-7(b)(8). Because this exception operates in an area of protected conduct, it must satisfy a strict vagueness standard so as not to chill the exercise of constitutional rights. Under this standard, the curfew's First Amendment "exception" makes the ordinance impermissibly vague. By defining the exception in vague and ambiguous terms, the ordinance impermissibly forces persons of normal intelligence to guess as to what conduct is illegal and fails to provide minimal guidelines for law enforcement.

The vagueness of the First Amendment exception is intuitively plain. Indeed, its language is anything but clear. What are "First Amendment rights"? What is considered to be "speech"? Does it include written communication? What of expressive conduct that does not involve oral or written communication? What types of speech are "protected" by "freedom of speech"? Is commercial speech protected? If so, to what extent? What is the "free exercise" of religion? And what of the "right of assembly"? Do two friends have the "right" to "assemble" or meet at a coffeehouse? This says nothing of the general First Amendment rights (e.g., association, press, petition) that the City's exception leaves unmentioned. The questions above are difficult enough for courts, Congress, and constitutional scholars, let alone for someone with no legal training. And when answers are given, they are often imprecise and turn on the specifics of a case and a balancing of many factors. Furthermore, First Amendment jurisprudence is a vast and complicated body of law that grows with each passing day. As a result, criminal conduct cannot be defined by simply referring to the title (First Amendment) or subtitle (speech or assembly) of a particular right.

Although the Supreme Court has not addressed the First Amendment issue before us, its decisions involving statutes that define criminal conduct by referring to the principles of constitutional "due process" and "equal protection" are instructive. Like the First Amendment principles of "freedom of speech" and the"free exercise of reli-

49

gion," due process and equal protection are complicated and nuanced constitutional concepts that are not susceptible to general definition. The existence of these rights likewise depends on the specifics of a case and a balancing of the interests involved. As I will show, the Supreme Court's opinions in Screws v. United States, 325 U.S. 91 (1945) (plurality opinion), United States v. Guest, 383 U.S. 745, 753-55 (1966), and later cases demonstrate that constitutional "due process" and "equal protection" are inherently too vague to be used to define criminal conduct without a carefully defined scienter requirement. This applies with at least as much, if not more, force to Charlottesville's mention of the First Amendment to define criminal conduct by way of exception.

In Screws the Court upheld a statute under which several law enforcement officers had been convicted of illegally depriving a prisoner of his life without "due process" of law. See 325 U.S. at 93, 100. The defendants were prosecuted under 18 U.S.C. § 20,[12] which made it illegal to "`willfully'" deprive another "`of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States'" under the color of state law. See id. They argued to the Court that this provision was impermissibly vague as applied to their convictions for depriving the deceased of "due process" because the law provided "no ascertainable standard of guilt." See id. at 94-95. Justice Douglas, writing for a four-justice plurality, said that

> the decisions of the courts are, to be sure, a source of reference for ascertaining the specific content of the concept of due process. But even so the Act would incorporate by reference a large body of changing and uncertain law. That law is not always reducible to specific rules, is expressible only in general terms, and turns many times on the facts of a particular case. Accordingly, it is argued that such a body of legal principles lacks the basic specificity necessary for criminal statutes under our system of government. Congress did not define what it desired to punish but referred the citizen to a comprehensive law library in order to ascertain what acts were prohibited. To enforce such a statute would

---

[12] 18 U.S.C. § 20 was the predecessor to 18 U.S.C. § 242, discussed infra.

50

> be like sanctioning the practice of Caligula who"published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it."

Id. at 96 (quoting Suetonius, Lives of the Twelve Caesars 278). Indeed, seven justices indicated that § 20's use of "due process" to define criminal conduct would have been unconstitutionally vague without something else to mitigate its ambiguous incorporation of constitutional principles. See id. at 105 (§ 20 must be construed with narrow scienter requirement to "avoid grave constitutional questions"); id. at 149-50 (Roberts, J., dissenting) ("[a]ll but two" justices agreed on this issue). However, the plurality concluded that the statute could be saved by construing "willfully" to require a specific intent to purposefully deprive another of a specific federal right made definite by the express terms of the Constitution and laws of the United States or by the decisions interpreting them. See id. at 100-05. Thus, Screws "recognized that the expansive language of due process that provides a basis for judicial review is, when incorporated by reference into § 242, generally ill-suited to the far different task of giving fair warning about the scope of criminal liability," Lanier, 117 S. Ct. at 1225 (unanimous decision), but that the use of a strict scienter requirement could sufficiently mitigate this ambiguity.

The Court in Guest relied on Screws to reject a similar vagueness challenge to a prosecution for conspiracy to deprive black citizens of rights protected by the Equal Protection Clause. The Court again emphasized that the specific intent requirement of 18 U.S.C. § 241, like that of § 242, removed the problem of the statute's vagueness. See Guest, 383 U.S. at 753-54; id. at 785 (Brennan, J., concurring in part) (incorporation of constitutional provisions"brings § 241 close to the danger line of being void for vagueness" but"stringent scienter requirement saves [it] from condemnation"); see also United States v. Kozminski, 487 U.S. 931, 941 (1988) (tension between requirement of "definite standard of guilt" and "incorporat[ion] by reference a large body of potentially evolving federal law" is resolved with strict scienter requirement).

Recently, a unanimous Supreme Court in Lanier reiterated the principles established in Screws and Guest . The Court again recognized that "in lieu of describing the specific conduct it forbids, [the] general

51

terms [of §§ 241 and 242] incorporate constitutional law by reference. . . . The result is that neither the statutes nor a good many of their constitutional referents delineate the range of forbidden conduct with particularity." Id. at 1224. Consequently, this "affront to the [due process] requirement" of fair notice is made permissible only when "willful violators" deprive (or conspire to deprive) others of rights that "have been `made specific' by the text or settled interpretations." See id. at 1225 (quoting Screws, 325 U.S. at 105). "[W]illful violators `certainly are in no position to say that they had no adequate advance notice'" of the definition of the crime. Id. (quoting Screws, 325 U.S. at 105).

Like the statutes in Screws, Guest, and Lanier, the Charlottesville curfew's First Amendment exception incorporates a large and growing body of law that is not reducible to specific rules and that turn on a balancing of numerous factors. Unlike the federal statutes, however, the City's curfew ordinance has no scienter requirement that could mitigate the inherent vagueness of First Amendment jurisprudence. Most important, though, the curfew regulates in areas involving constitutionally protected activity, while §§ 241 and 242 do not. In fact, those sections are designed to punish those who willfully deprive and conspire to deprive others of constitutional rights, as, for example, in United States v. Lanier, where the defendant, a state judge, sexually assaulted (in his office) several employees and others who had business before him. Lanier, 117 S. Ct. at 1222-23. Such conduct lies far outside of the realm of constitutionally protected action, and therefore §§ 241 and 242 do not have to meet the strict vagueness standard that applies when protected activity is involved. The curfew, however, does. Consequently, the ordinance must survive scrutiny under a vagueness standard much more strict than that applied in Screws and Guest. Under that standard and in light of the absence of a scienter element capable of saving the ordinance, I would hold that the First Amendment exception and the ordinance are void for vagueness.**13**

_____

**13** The majority misses the mark when it says that a scienter requirement would necessarily expand, and not narrow, the breadth of Charlottesville's curfew because subsection (b)(8) "provides an exception from liability" and does not affirmatively define criminal conduct. See ante at 16 n.*. The curfew ordinance uses section (b) and its eight exceptions to define what conduct is illegal. See City Code § 17-7(b). With

The testimony of Charlottesville's Chief of Police proves the statute's ambiguity. When asked whether two fifteen-year-olds violate the ordinance by discussing politics in a coffee shop during the curfew, the Chief said, "You're indoors, it's a public location, I . . . think technically under the ordinance it may be a violation. I doubt whether we would deal with it." Similarly, when asked if a fifteen-year-old who plays in a band in a local restaurant after curfew hours violates the curfew when he is not paid for the performance, the Chief answered, "I think that technically [the minor] is possibl[y] in violation of the ordinance." However, "the officer would obviously have to make a decision about whether they're in violation or not. And I believe there's some discretion allowed." It is this discretion combined with the failure to define with specificity what conduct is illegal that makes the statute unconstitutional. The danger of chilling the exercise of constitutionally protected activity arises because of the uncertainty associated with the First Amendment exception.**14**

The majority errs in supporting its reasoning with the fact that city councils appear to be placed "between a rock and a hard place," ante at 16. While it is true that curfews without exceptions will almost always impermissibly infringe upon substantive constitutional rights and that curfews with exceptions may be subject to vagueness challenges, invalidation of this ordinance is still mandated by our Constitution. "Our Constitution is designed to maximize individual

_____

respect to subsection (b)(8) in particular, the ordinance makes it a crime for minors to remain in public when not exercising First Amendment rights. See id. § 17-7(b), (b)(8). Subsection (b)(8) thus plainly incorporates the First Amendment to define the scope of criminal conduct. Even when a law is drafted to include exceptions in defining the crime, a scienter element that is applied to the criminal provision as a whole (and not just its exceptions) can reduce the objectionable vagueness of the law.

**14** It is of no constitutional consequence that the Chief testified that "if there's a question [as to whether the First Amendment exception applied,] we would go down on the side that it was a valid Constitutional kind of activity" and "would consult with the Commonwealth Attorney or the city attorney's office to see whether it was or not." "Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." Baggett, 377 U.S. at 373.

freedoms within a framework of ordered liberty. Statutory limitations on those freedoms are examined for substantive authority and content as well as for definiteness or certainty of expression." Kolender, 461 U.S. at 357 (emphasis added); see also Nunez v. City of San Diego, 114 F.3d 935, 943-44 (9th Cir. 1997) (recognizing that interpreting curfew to avoid vagueness problems under Due Process Clause "may make it more difficult for the statute to pass constitutional muster on substantive grounds"). "[L]egislative bodies in draftsmanship obviously have the same difficulty as do the judicial in interpretation. Nevertheless despite the difficulties, courts must do their best to determine whether or not the vagueness is of such a character `that men of common intelligence must necessarily guess at its meaning.'" Winters v. New York, 333 U.S. 507, 518 (1948); see also Kingsley Int'l Pictures Corp. v. Regents of the Univ., 360 U.S. 684, 694 (1959) (Frankfurter, J., concurring). Although we may "appreciate the difficulties of drafting precise laws," we must require that all statutes meet constitutional standards for clarity. See City of Houston v. Hill, 482 U.S. 451, 465 (1987). If we did otherwise, we would forgo our duty to enforce the mandates of the Due Process Clause. **15**

Taken to its logical conclusion, the majority's reasoning would immunize all statutes regulating conduct involving the exercise of First Amendment rights whenever they contain a First Amendment "exception." Because such provisions would not be impermissibly

_____

**15** I also disagree with the majority's claim that the First Amendment exception "fortifies, rather than weakens, First Amendment values." See ante at 16. Because First Amendment rights can never be diminished by a city ordinance, see U.S. Const. art. VI, cl. 2, the City's exception does nothing but restate a well-settled constitutional restriction on its substantive regulatory authority. Indeed, the majority's citation to CISPES v. FBI, 770 F.2d 468 (5th Cir. 1985), contradicts its position. Cf. ante at 16. CISPES recognized that "such a provision cannot substantively operate to save an otherwise invalid statute." See 770 F.2d at 474. A statement similar to the First Amendment exception in this case, however, was used by the Fifth Circuit to determine Congressional intent and guide its construction of the provision to avoid substantial overbreadth. See id. Here, though, we are faced with a local, not a federal, statute, and therefore we are without the authority to provide a limiting construction that might save the ordinance. See Hynes, 425 U.S. at 622. The First Amendment exception thus does little to advance First Amendment values.

54

vague under the majority's analysis, the statutes would be immune from both substantive and vagueness challenges. Substantively the statute cannot, according to its own terms, violate the constitution. In fact, it incorporates the Constitution's protections. The upshot is that facial attacks could never be brought and that statutes containing these exceptions could be challenged only as they are applied. This squarely conflicts with the Supreme Court's long-standing concern with the potential chill of constitutionally protected activity created by the mere existence of vague criminal statutes and the potential for their arbitrary enforcement.

For these reasons, I would hold that the curfew's First Amendment "exception" renders the ordinance impermissibly vague on its face. Until the ordinance is amended by the City Council or given a construction by state courts that sufficiently reduces its unconstitutional vagueness, its enforcement conflicts with the constitutional guarantee of due process of law.

IV.

In sum, I would hold that equal protection challenges by minors to laws that regulate in the area of fundamental rights must be subject to strict scrutiny. In my opinion the Charlottesville ordinance fails this standard. Even if the ordinance survived the equal protection challenge, however, it would be unconstitutional in its present form. The curfew's First Amendment exception is impermissibly vague in violation of the Due Process Clause. For these reasons, I respectfully dissent.

55